

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-18-00826-CV

In the **INTEREST OF K.N.J.**, N.-L.F.J., and F.J.J., III, Children

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-PA-01058
Honorable Charles E. Montemayor, Associate Judge Presiding[1]

Opinion by: Luz Elena D. Chapa, Justice

Sitting: Rebeca C. Martinez, Justice
Luz Elena D. Chapa, Justice
Beth Watkins, Justice

Delivered and Filed: July 3, 2019

REVERSED AND RENDERED IN PART

Shari J.[2] appeals the trial court's order terminating her parental rights, arguing there is

legally and factually insufficient evidence that termination of her parental rights is in the children's

best interest. We conclude the evidence is insufficient to prove termination of Shari's rights is in

the children's best interest and reverse that part of the trial court's order. We do not disturb the

rest of the order, including the order appointing the Texas Department of Family and Protective

Services as sole managing conservator of the children.

---

[1] The Honorable Linda Rodriguez, retired judge sitting by assignment, presided over the trial; however, the Order of Termination was signed by Associate Judge Charles E. Montemayor.
[2] To protect the identity of minor children in an appeal from an order terminating parental rights, parents are referred to by their first names and children are referred to by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

**PROCEDURAL BACKGROUND**

The children—K.N.J. (born in 2006), N.-L.F.J. (born in 2008), and F.J.J. (born in 2009)—were removed from the custody of their father, Francis, in May 2017, after allegations of physical abuse and neglect on the part of Francis and his girlfriend and reports the children had been sexually acting out with each other. The Texas Department of Family and Protective Services filed a petition for protection, conservatorship, and termination of Francis and Shari's parental rights. When the petition was filed in May 2017, Francis was the children's permanent managing conservator and Shari was a possessory conservator, pursuant to a June 2015 final order in a previous case.

The trial court issued temporary orders naming the Department the children's temporary managing conservator and both Shari and Francis possessory conservators. The trial court also appointed an attorney ad litem and a guardian ad litem for the children and used the services of a CASA volunteer who had worked with the children in the previous case. Shari signed a family service plan in July 2017. The case was pending for seventeen months and was tried to the bench in October 2018. The witnesses at trial were Arden Dana, the therapist for the two younger children, the CASA volunteer N.M., Department caseworker Lenore Salazar, Department supervisor Mary Rosetti, Francis, and Shari.

During the trial, Francis signed an irrevocable affidavit, relinquishing his parental rights. At the conclusion of trial, the Department sought termination of Shari's rights on the grounds that she had not completed her plan of services and termination was in the children's best interest. The Department also argued that if the court did not believe it had met its burden, then the Department should be named the children's permanent managing conservator and Shari be named a possessory conservator and be required to continue her therapy. Shari, the children's guardian ad litem, and their attorney ad litem all argued termination was not in the children's best interest, asked the court

to deny the request to terminate Shari's parental rights, and argued Shari should retain her rights as a parent possessory conservator. The trial court took the case under advisement. The court subsequently signed an order terminating both parents' rights. The court found by clear and convincing evidence Shari failed to comply with the provisions of the family service plan and termination of her rights was in the children's best interest.

On appeal, Shari argues the order of termination should be reversed because the evidence is legally and factually insufficient to support the trial court's finding that the termination of the parent-child relationship between her and the children is in the children's best interest.

### THE EVIDENCE

*History with the Department*

The testimony at trial disclosed that the children were removed from Shari's custody in July 2014 as a result of allegations Shari's boyfriend had sexually abused them. That case resulted in a June 2015 final order that named Francis the children's permanent managing conservator and Shari a possessory conservator. CASA volunteer N.M. first became involved with the children during the first case.[3] She testified that while that case was pending, the children were evaluated and placed on medication, they were each receiving individual therapy, and one or two were receiving occupational therapy. She testified Francis was provided resources and support to continue these services for the children after the case was over. However, according to N.M., after Francis took custody of the children, their medication regimen and all therapy and other services were discontinued.

---

[3]At the request of the Department, the trial court took judicial notice of a report N.M. prepared and filed with the clerk; however, the report was not offered or admitted into evidence. A trial court may take judicial notice that a document has been filed in its records, but may not take judicial notice of the truth of the substantive statements in the document. *See In re B.R.*, 456 S.W.3d 612, 617 n.4 (Tex. App.—San Antonio 2015, no pet.).

The previous final order also provided Shari would have weekend visitation with the children. Department supervisor Mary Rosetti and N.M. testified Shari exercised some of her visitation rights, but Francis had restricted her visitation and controlled how, when, and where she could see the children. Shari testified she lost her job and was unable to make child support payments for six months. Francis told her she could no longer visit the children and did not allow the children to talk to her on the telephone or visit her. Shari testified that at that time, she believed Francis's statements suggesting she forfeited her right to visits because she was not paying child support. She also testified she was therefore unaware of the conditions the children were living in and the mistreatment they were suffering.

Rosetti testified the Department began receiving referrals about possible abuse and neglect of the children in October 2016. The children were living with Francis, his girlfriend and multiple generations of the girlfriend's family in a small home. The allegations generally concerned lack of supervision, physical abuse, sexual abuse, and concerns the children were being sexually inappropriate with each other. The children were removed from the home in May 2017. The oldest, K., was admitted to a psychiatric hospital for several months and then transferred to a group residential treatment center, where she remained at the time of trial. The two younger children were initially placed at the Children's Shelter and later placed in separate foster homes.

### The children

All three of the children are in counseling. Arden Dana is a child and family therapist who is specially trained in trauma focused, cognitive behavioral therapy. Dana testified she had been treating N., a ten-year-old female, for about eight months, and F., an eight-year-old male, for six months. Dana testified she had never met Shari or the oldest child, K.

Dana meets with N. weekly. She testified N. has been the victim of traumatic physical abuse perpetrated by her mother's previous boyfriend and by Francis and Francis's girlfriend.

Dana testified N. disclosed knowledge about sexual activity a child her age would not normally have and N. was found accessing pornographic websites on her tablet. At the beginning of May 2018, N. started disclosing sexual assaults on her and her sister K. by her father.[4] Dana also discussed with N. the reports that N. and K. had been sexually acting out with each other. Dana testified N. admitted the conduct, stating her sister had initiated it and their father had taught her. According to Dana, N. is working through her issues and has made significant progress. She stated N. has progressed from being extremely angry and aggressive to being more able to talk about her feelings and to trust the adults in her life. Dana testified N. is in a temporary foster home where she has adjusted fairly well and is happy. Dana testified N. wants to live with her mother and is adamant about wanting to keep the sibling group together.

Dana began therapy sessions with eight-year-old F. in late April 2018. He had suffered physical abuse but did not demonstrate indicators strongly suggesting sexual abuse. Dana testified F. is inclined to aggressive behavior and has had some issues in school and with his peers. She testified he also lies frequently because he is fearful of being harmed if he tells the truth. They are working in therapy to help F. learn he is now in an environment where the truth is acceptable and where consequences for wrongdoing are reasonable, such as loss of privileges instead of physical violence. Dana stated F. is in a very loving and nurturing foster home. He is happy there and would be happy staying there permanently; however, the foster parents are an older couple who do not feel capable of raising a child as young as F. Dana testified F. has also expressed a desire to live with his mother.

---

[4] When Dana initially contacted the Department about N.'s outcry, the Department advised her this was a known allegation relating to Shari's former boyfriend that had been investigated. Francis also asserted N. was confused. Dana testified she talked with N. at length, her allegations were very specific, and N. was very clear that she was talking about her father. The allegations were referred to the police, and Francis's visitation with the children was suspended after a hearing in May 2018.

Dana testified both N. and F. continue to have problems with aggressive behavior and need continued therapy. She is working with them to understand the reasons for the behavior and to understand how it negatively affects them and to find more productive and appropriate ways to express themselves.

K.'s therapist did not testify. However, CASA volunteer N.M. testified K. is under a specialized level of care in an institutional residential treatment center. She testified that although it is not a home environment, it is very structured, which is what K. needs. She stated K. had only recently opened up about some of the trauma she had suffered, and she needed continued around-the-clock structured, supportive, therapeutic supervision to move forward. N.M. testified she was hopeful K's placement could change as she makes more progress.

All three of the children are on medication, according to Department caseworker, Lenore Salazar, and will need therapy for a long period of time. In addition, N.M. testified all three have specialized educational needs. Finally, there was a consensus among the Department's witnesses that the children should remain in a structured environment with direct supervision. Although each of the children was doing well in their placement at the time of trial, none of them was in a permanent placement. Neither Francis nor Shari had identified any suitable family or fictive kin with whom to place the children. Supervisor Rosetti testified F. was not having as many issues as he had previously, and if he continued progressing, she had hopes the Department could find a foster-to-adopt home for him. Dana and N.M. testified about the children's desires to be together and supported the goal, but emphasized it was only a possibility for the future and would require a highly structured home with very involved and supportive parenting. Caseworker Salazar agreed with Rosetti that at the time of trial there was no path to permanency in place for any of the children.

Rosetti, Salazar, and Dana all testified the children are bonded with their mother, love her, and want to maintain their relationship with her and continue visiting with her. Rosetti testified the children look forward to their visits with her and the visits are "a big bright spot" in their lives.

***Shari***

In her testimony, Shari acknowledged the children had been abused both by her previous boyfriend and by their father. She testified she understands the children have gone through trauma and face significant challenges as a result. She testified she did not know about the abuse by Francis when it was occurring because he had prevented her from seeing or talking to the children, but she believed the children when they outcried. Shari testified her individual counseling has helped her understand how much support the children need. Shari testified she has not had any contact with her former boyfriend in three or four years. Salazar, Rosetti, and N.M. each testified that to their knowledge Shari had not engaged with any individual during the pendency of the case who posed a danger to the children.

N.M. testified Shari's visits with the children go well and N.M. does not have any major concerns about them. Shari is also engaged and attends the children's appointments. However, N.M. testified Shari's comprehension and recall of the instructions for the children's care is not always clear or accurate. She observed Shari has difficulty keeping track of the details of all three children's care and their specific individual therapeutic, medicinal, and educational needs.

Salazar testified Shari acknowledged to her that she is not ready to parent all three children. However, Shari testified she believes her therapy is helping her and she wants to maintain her relationship with her children. She would like for all of them to continue their individual therapy and to start family counseling when the children are ready. Shari testified she would pay child support if she were allowed to remain a possessory conservator.

*The family service plan*

Salazar and Rosetti testified Shari had completed much, but not all, of her family service plan and stated their opinions that Shari had not demonstrated the progress necessary to properly care for the children. Shari submitted to a psychological evaluation as required by the plan. The evaluation report noted Shari's IQ is 82 and she might have some cognitive impairments. The evaluator recommended Shari have a psychiatric evaluation, and supervisor Rosetti told Shari at a hearing one month before trial that she needed to schedule a psychiatric evaluation for long-term mental health treatment. Shari testified she had been calling the person to whom the Department referred her for three to four weeks, but the calls were not answered and she had not received a response. There was a suggestion Shari had taken prescription medication for "mental health issues" sometime in the past, but no further evidence was presented regarding any mental health needs Shari may have. Shari complied with the drug testing requirements of the plan and Rosetti testified there were no concerns in that area.

Rosetti testified Shari had complied with the plan requirement that she obtain and keep stable income, but she had not obtained appropriate housing. Shari works at two hotels, doing housekeeping. She lives in a small cottage on the grounds of one of the hotels. Rosetti testified Shari had been in the cottage for a long time and it was stable for her. However, Rosetti and Salazar testified the housing was not appropriate for three children. According to Salazar, the cottage is the size of an efficiency apartment and there is only room for two people. She testified this poses a concern because one of the reasons the children are in separate placements is because they were acting out on one another; if they were to live together, they would need to have their own space, apart from their siblings. Salazar does not know if there is larger housing available to Shari on the hotel grounds. Shari testified she is looking for more spacious housing, but explained in the meantime she would be able to place dividers in the cottage in order to provide separate

sleeping areas for the children. She expressed concern about signing a lease on a three bedroom apartment when the Department had told her the children would not be returned to her custody. Rosetti and Salazar both testified Shari had not complied with the housing requirement of the plan.

The family service plan also stated that before the children would be placed in Shari's home, Shari was required to provide the Department a written plan and schedule to help ensure the children would not sexually act out or behave inappropriately with each other. Rosetti testified Shari had not submitted such a plan.

Shari completed the plan requirement that she attend individualized parenting classes. Shari also consistently visited with the children throughout the case, having supervised visits of one to two hours with all three children three or four times a month. The Department's witnesses testified Shari followed the Department's rules, behaves appropriately, and the children enjoy the visits. N.M. testified she had no major concerns about Shari at the structured visits she had attended. Rosetti testified, "When the visits have moved outside of the Department into the public, she has a lot of difficulty communicating and spending time and maintaining all three of the children at once." Rosetti clarified her information about a visit outside the department did not come from personal knowledge, but from "documentation" she received and the visit referred to had occurred at least several months before trial.

Salazar testified Shari also did not complete the individual counseling requirement in the plan because she had not been successfully discharged from therapy. However, the plan required only attendance and participation, not discharge. Salazar testified Shari had engaged in the individual therapy required by the plan and continued in therapy at the time of trial. Shari's therapist did not testify. However, Salazar testified she had spoken with Shari's therapist "in depth," and Salazar received a report from the therapist about ten days before trial. According to Salazar, the therapist believes Shari has made a great deal of improvement and is progressing.

Salazar testified the therapist told her Shari has a better understanding of the events that had occurred, her role in the removal of her children, and the children's issues. The therapist recommended Shari be given more opportunities to be with her children. However, Salazar did not ask what the therapist meant by greater opportunities with her children and the Department never considered expanding Shari's visitation. In Salazar's opinion, Shari is complying with the therapy requirement, but has not completed it.

Rosetti does not agree with Shari's therapist and testified she did not believe Shari had fully engaged in individual therapy or taken responsibility for her behavior and the trauma the children have experienced. Again disagreeing with Shari's therapist, Rosetti testified she did not see any progress in Shari's understanding of the children's needs or of how to be protective of them. When asked the basis for her opinions, Rosetti related several conversations she had with Shari. The first occurred in May 2018, five months before trial, just after N.'s outcry of sexual abuse against Francis. Shari and Rosetti were at a hearing on a motion to curtail Francis's visitation and heard the therapist's testimony about N.'s outcry. In a conversation after the hearing, Shari's primary concern appeared to be the effect on Francis, rather than the trauma suffered by the children, leading Rosetti to question Shari's ability to protect the children. Then at the final hearing before trial, Rosetti spoke at length with Shari and told her the Department would be seeking termination of her rights because she was unable to provide a safe and stable home for the children. Rosetti testified Shari asked if it would be possible for her to retain custody of just one of the children, and Rosetti interpreted this as Shari failing to understand the issues and the children's needs.

### The witnesses' conclusions and recommendations

Dana, the therapist for the two youngest children, did not make a recommendation about terminating Shari's parental rights. Dana testified she has never met Shari and could not say

whether it would be safe or appropriate for the children to be returned to her care. However, based solely on the history provided by the Department, she had some concerns because two of the men Shari had previously chosen to be with had been abusive to the children. Dana testified she would like to see the children placed together in the future. It would need to be a specific, well-informed and highly structured placement, in a home prepared to provide the appropriate level of supervision, and the children were not ready for that at the time of trial. Dana testified if the children could not be returned to their mother and if they were to be placed together in a foster-to-adopt home, then she would have concerns about Shari maintaining possessory rights because that would make it difficult for the children to accept and transition to the new parents. Dana testified that in the absence of such a permanent placement, the children would not be harmed by continuing their relationship and visits with Shari.

CASA volunteer N.M. recommended Shari's parental rights be terminated. With respect to managing conservatorship, she testified that although Shari had made significant progress in learning to take care of herself, she has not reached the point where she can also take care of her children. N.M. believes Shari is not able to provide the day-to-day level of supervision and structure the children need, is not capable of keeping track of the individual needs of all three children and does not have housing suitable for all three children.

N.M. testified she had no concerns about Shari's visits with the children, but she had never discussed with the Department the idea of extending the period of possession or the possibility of placing just one of the children with Shari. N.M. testified she would rely on the therapist's recommendations as to whether it would be in the children's best interest to continue visiting with Shari. Nevertheless, N.M. recommended Shari not maintain possessory conservatorship because it is her understanding the Department will not look for a long-term placement for the children if Shari retains any of her parental rights.

Caseworker Salazar recommended termination of Shari's parental rights because after seventeen months of working services, she was not able to parent all the children at the time of trial. Salazar testified that based on her several brief conversations with Shari, her review of the documentation, and her extensive discussions with Shari's therapist, she believes Shari understands her role in the Department's involvement with the children and understands the children's issues "to the best extent that she can." Salazar also testified Shari has acknowledged that her former relationships and the decisions she made during those relationships harmed her children. Nevertheless, for reasons she did not explain, Salazar believes Shari's insight is "not where it could be" and testified she does not believe Shari will follow through when she chooses her next boyfriend. Salazar testified all three children have a high level of need and she does not believe Shari has the ability to meet the needs of one child with a basic level of care.

Salazar testified she is opposed to Shari retaining possessory conservatorship because if she were to do so and continue visits with the children, the children would not be able to achieve permanency through adoption. When questioned further, Salazar clarified that the children are not in placements now that will lead to permanency and there is no "quick path to permanency" for them. She testified the children still need to be separated, will need years of therapy, and, perhaps with the exception of F., need to achieve further stability before they are ready for long-term placement. Salazar did not explain why it would not be in the children's best interest for Shari to be named a possessory conservator while the children continue to work through their trauma and Shari continues to progress in therapy. Nor did Salazar explain why the Department would not look for long-term placement if Shari retained possessory conservatorship.

Supervisor Rosetti also recommended terminating Shari's parental rights. She testified she does not believe Shari can provide a safe and stable environment for the children, and, although there is a possibility Shari could continue to progress and get to a point where she could properly

care for one or more of the children, the Department does not want to restrict permanency for the children in the hope something may change in the future. Rosetti does not believe Shari should retain even possessory rights because "in the pool of potential placements that exist among the Department, [there are] more people available to be permanent placements for children once the parent's rights have been terminated." In other words, "the odds of permanency [are] increased if the rights of the parents are terminated."

Shari, the children's guardian ad litem, and their attorney ad litem all argued termination of Shari's rights is not in the children's best interest. They requested that the trial court not terminate Shari's rights and asked she be allowed to remain the children's possessory conservator.

## STANDARD OF REVIEW

"Because the natural right between a parent and his child is one of constitutional dimensions," proceedings to terminate parental rights must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). Both the Texas Family Code and the Due Process Clause of the United States Constitution thus require the State to meet the heightened evidentiary standard of clear and convincing proof. *See* TEX. FAM. CODE § 161.001(b); *Santosky v. Kramer*, 455 U.S. 745, 753-58 (1982); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

We also apply a heightened standard on appeal when we review the sufficiency of the evidence to support an order terminating parental rights. In reviewing the trial court's findings for legal sufficiency, we look at all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder

resolved disputed facts in favor of its finding if a reasonable factfinder could do so and we disregard all evidence a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* We must consider the undisputed or uncontradicted evidence in our review, even if that evidence does not support the trial court's finding. *K.M.L.*, 443 S.W.3d at 113; *J.F.C.*, 96 S.W.3d at 266. "Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence." *J.F.C.*, 96 S.W.3d at 266. If we determine from our review of the record evidence that no reasonable factfinder could form a firm belief or conviction that termination of a parent's rights is in the children's best interest, then we must conclude the evidence is legally insufficient. *See id.*

In determining whether the evidence is factually sufficient to support the trial court's finding that termination of Shari's rights is in the children's best interest, we give deference to the trial court's findings, but we also consider and weigh the disputed and contrary evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing" and determine whether "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

### SUFFICIENCY OF EVIDENCE TO SUPPORT BEST INTEREST FINDING

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). A court must also presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See In re C.H.*, 89 S.W.3d at 27-29. The Texas Supreme Court has articulated the following factors

to assist our review of whether the facts and circumstances support a finding that termination of the parent's rights is in a child's best interest: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exclusive or exhaustive, and not every factor must be proved to find termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27.

### *Desires of the children*

The undisputed evidence showed the children want to maintain a relationship with their mother and want to continue visiting with her. Additionally, Dana testified N. would like to live with her mother. F. has said he would be happy staying in his current foster home, but has also expressed he would like the opportunity to live with his mother. The Department presented no evidence about K.'s desires. This factor weighs against termination of Shari's rights.

### *The emotional and physical needs of the children*

The Department presented general testimony that all three of the children have therapeutic, medicinal, and educational needs and they benefit from direct supervision and structure. Dana testified she sees N. almost weekly, and Salazar testified the three children could need therapy for many years. Salazar testified K. was in a residential treatment center receiving a specialized level of care, which was what she needed at the time of trial. The Department did not present any further evidence about the children's medications or about any educational services they may be receiving.

Shari acknowledged the children are on medication and have behavioral challenges and she testified to her commitment to keeping them in therapy and providing whatever else they need. However, N.M. testified Shari has difficulty understanding and recalling the details of the children's individual needs. N.M. does not believe Shari is capable of "juggling" the needs of all three children and providing the supervision and structure they need. Shari also did not submit the written plan required by the Family Service Plan that sets out how she would provide supervision and structure to the children if she obtained custody.

The evidence established Shari has stable housing. However, the housing is insufficient to provide separate sleeping quarters for each of the children. The evidence established Shari has stable employment and is willing and able to pay child support if she retains possessory conservatorship. The Department did not present any evidence Shari cannot meet the children's emotional needs. To the contrary, its witnesses testified the children are bonded with Shari and their visits with her are a "bright spot" in their days. We conclude this factor weighs slightly in favor of the trial court's best-interest finding.

### The emotional and physical danger to the children now and in the future

The Department contends this factor supports terminating Shari's parental rights, pointing to evidence of a pattern of relationships with abusers and asserting Shari has not acknowledged the harm her former partners have caused the children. The evidence showed that after Shari and Francis separated, she was living with her boyfriend and had custody of the children. There was testimony that Shari's boyfriend abused K. and N. The Department removed the children from Shari and placed them with Francis, who also sexually and physically abused them. N.M., Salazar, and Rosetti testified they were concerned Shari's past pattern of relationships with abusers showed a lack of protective capacity and posed a danger to the children. However, Salazar and Shari testified Shari had been addressing this issue in counseling. Salazar testified, based on her "in-

depth" conversations with Shari's therapist, that Shari has acknowledged the harm her paramours have caused the children and understands her role in causing the harm.[5] Salazar, Rosetti, and N.M. all testified they had no reason to believe Shari had any relationships during the pendency of the case that would be of concern to the Department or posed a danger to the children. And in her testimony at trial, Shari expressly acknowledged Francis and her former boyfriend had abused her children, causing them significant harm. She further explained how she would recognize the warning signs of a potentially abusive relationship and how she planned to avoid them in the future.

Nevertheless, Salazar believed Shari's insight is "not where it could be" and expressed concerns about her ability to choose a future partner. Salazar did not state the basis for this opinion. Rosetti also opined that Shari lacks protective capacity. When asked to specify the basis for her opinion, Rosetti testified it was the fact Shari appeared more concerned about Francis's feelings than the children's safety following the May 2018 hearing about N.'s outcry of sexual abuse by Francis. Rosetti did not explain why she believed Shari had not made any progress between the time of that hearing and the October trial or why she disagreed with the evaluation of Shari's therapist. The Department did not present any factual evidence to support its witnesses' opinions that Shari had not progressed sufficiently in her therapy by the time of trial to be protective of her children. *See In re C.C., III*, 253 S.W.3d 888, 894 (Tex. App.—Dallas 2008, no pet.) (holding vague assertions and conclusions without factual bases do not constitute clear and convincing evidence); *In re K.M.J.*, No. 04-18-00727-CV, 2019 WL 1459565, at *7–8 (Tex. App.—San

---

[5] The Department asserts in its brief that Shari "refused to acknowledge to Cisneros-Salazar any wrongdoing on the part of her former paramour." That was not Salazar's testimony. Salazar was asked whether Shari "acknowledged any wrongdoing by [the former boyfriend] in the prior case," and Salazar responded, "No, not to me." However, Salazar also testified she and Shari had not discussed Shari's prior relationships at all. There was no evidence that Shari "refused" to acknowledge to anyone that the abuse had occurred.

Antonio Apr. 3, 2019, pet. denied) (mem. op.) (holding testimony offered without any factual support was conclusory and not probative).

The therapist, Dana, testified there was no harm to the children in allowing Shari to continue regular visitation with the children as long as they were not in permanent placements intended to lead to adoption. The evidence does not establish that maintaining the parent-child relationship would pose an emotional or physical danger to the children. This factor does not support a finding that termination of Shari's parental rights is in the children's best interest.

### The parental abilities of the individuals seeking custody

Shari completed the one-on-one individualized parenting class required by the Family Service Plan. She also had weekly one-to-two-hour visits with the children throughout the case, during which her interactions with the children were observed to be appropriate.

The Department's evidence about Shari's parenting skills focused on her difficulties in parenting all three children at once. Rosetti testified Shari had difficulty "maintaining all three of the children at once" when the visits were outside the structured environment of the Department. And N.M. testified she does not believe Shari has the ability to juggle all the children's individual needs. Further, Shari failed to prepare and submit a written plan to show how she would provide structure and supervision for all the children, as required by the family service plan. The Department also presented testimony that the results of Shari's psychological evaluation reported her IQ was 82 and noted there may be some cognitive impairment. However, the Department did not present any evidence about the significance of the IQ score and did not present any evidence of actual cognitive impairment or its effect on Shari's ability to parent one or more of the children.

Neither Rosetti nor Salazar believe Shari is currently able to parent a single child; however, they did not present evidence to support their beliefs. Salazar testified she was concerned when Shari asked about the possibility of obtaining custody of N. because N. needs continual supervision

around younger children and has "high needs," and "I don't know whether or not mom is able to meet her needs at this time." However, N. would not be living with younger children if she were in Shari's care. And Salazar's lack of knowledge is no evidence Shari could not appropriately parent N. or F. and meet their needs. *See E.N.C.*, 384 S.W.3d at 810 (witness's conjecture is insufficient to meet Department's burden). Moreover, the Department has not considered giving Shari more opportunities with the children, such as more visits or longer periods of possession with one child that might illuminate her ability to parent one of the children, even though Shari's therapist believes she has made significant progress in therapy and should be given such opportunities.

Although the Department's evidence supports not naming Shari managing conservator of all three children, it is only slight evidence supporting a finding that termination of her parental rights is in the children's best interest.

### *The programs available to assist these individuals to promote the best interest of the children*

The services the children are receiving will continue whether Shari's rights are terminated or she retains possessory conservatorship. No further evidence was presented regarding this factor and it therefore does not weigh in favor of termination.

### *The plans for the children by these individuals or by the agency seeking custody and the stability of the proposed placement*

The Department's plans for the children is to keep them in their separate temporary placements for the foreseeable future while they continue to work with their therapists. The witnesses testified N. and F. are in good temporary foster homes that are meeting their needs while the children work through their trauma. There was evidence neither of the homes are permanent placements, but there was no evidence about how long N. and F. may remain in those foster homes. N.M. testified K. is in an institutional residential treatment center, which provides the structured

and therapeutic supervision she needs right now. N.M. has hopes that as K. progresses, other placement options will open for her; however, there was no evidence of what her prognosis is. Salazar testified the children need to continue their therapy and get to a place of stability before the Department would start getting them prepared to look for a permanent placement. Testimony was not elicited from the witnesses estimating how long this would take.

Shari testified she wanted to continue her individual therapy and begin family counseling when the children are ready. She has employment and housing. She testified she continues to look for a larger home, but testified she could create private spaces in her current home with dividers.

In sum, there are no immediate or near-immediate plans for permanent placement of the children that would preclude Shari and the children from continuing to progress in their therapy and potentially reach reunification. In light of the fact the children are progressing well while Shari has possessory conservatorship, the absence of a permanent plan for any of the children does not support a finding that terminating her parental rights is in the children's best interest.

***The acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one and any excuse for the acts or omission of the parent***

There is no evidence Shari has an inappropriate relationship with any of the children. The undisputed evidence is she has good relationships with all of the children, they are bonded and love each other. The only ground the Department argued for termination at trial and the only ground found was that Shari failed to complete her service plan.

There was general testimony the Department removed the children from Shari's custody in 2014 because of allegations of abuse by Shari's boyfriend, but the record contains no details about that case or about Shari's acts or omissions that may have contributed to the children's removal in that case. At the conclusion of the 2014 case, the children were placed with Francis.

Rosetti testified she feels Shari is culpable in the conduct that led to the children being removed from their father because Shari had visitation with the children and should have recognized the signs of abuse. However, there was uncontradicted testimony Francis restricted Shari's possessory rights, limiting when and where she could see the children and then prohibited her from seeing them at all for six months when she lost her job and was unable to pay child support. Shari gave uncontradicted testimony that she was not aware of any of the physical abuse occurring in that home. This factor also does not weigh in favor of termination.

The Department's burden was not to simply prove Shari should not have custody of her children; its heightened burden was to prove, by clear and convincing evidence, that it is not in the children's best interest for them to have any legal relationship with her whatsoever. *See J.A.J.*, 243 S.W.3d at 614-17 (distinguishing conservatorship from termination). The evidence must therefore permit a factfinder to reasonably form a firm conviction or belief that appellant should no longer be in the children's lives as their mother, not merely that appellant should not have custody. *See id.* at 616.

Only two of the *Holley* factors—Shari's ability to meet the children's physical needs and her parenting abilities—weigh in favor of the trial court's finding. None of the remaining factors support a finding that termination of Shari's parental rights is in the children's best interest. All of the children want to continue a relationship with their mother. N. and F. would both like to return to live with their mother, and there was no evidence about what K. desires in this respect. The Department did not show that maintaining the parent-child relationship poses a physical or emotional danger to the children. Shari's therapist reports Shari has made substantial progress and is ready for greater opportunities with the children. And N. and F.'s therapist testified visits with Shari are positive for the children and continuing Shari's possessory conservatorship would be harmful only if it prevented placement in a foster-to adopt home. While we agree that children

who are ready for permanent placement in a safe and stable home should ordinarily not have to wait for a parent to turn their life around, the undisputed evidence is that there is no permanent placement in the near future for these children.

Essentially, the Department asserts that if and when the children achieve stability and reach a point in their therapy where they are ready for a permanent placement, the pool of potential foster-to-adopt homes will be smaller if Shari maintains her parental rights. However, in this case, the children are doing well and progressing in their current temporary placements and it is undisputed they will remain under the managing conservatorship of the Department for the foreseeable future. Based on this record, although there is sufficient evidence to support the trial court's findings regarding conservatorship, the evidence is insufficient to support the court's finding that termination of Shari's parental rights is in the best interest of the children.

In light of all the facts and circumstances, we conclude no reasonable factfinder could form the firm belief or conviction that termination of Shari's parental rights is in the best interest of K., N., and F. We therefore hold the evidence is legally insufficient to support the trial court's order terminating Shari's parental rights. We reverse that part of the order and render judgment denying the Department's request for termination of the parent-child relationship. We do not disturb the part of the order that appointed the Department as the children's permanent managing conservator.

Luz Elena D. Chapa, Justice